IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEFFREY VOGELSBERG,

               Plaintiff,

  v.

YOUNG KIM, CHERYL WATERS, SATINDER
DHANOA, BRENDA BREDLOW, STEPHANIE
WEBSTER, MELISSA BENNETT, TENZIN ENDERS,
JAMES MATTHEWS, CORRECT CARE SOLUTIONS,
and DANE COUNTY,

               Defendants.[1]

OPINION and ORDER

17-cv-596-jdp

---

This case arises out of plaintiff Jeffrey Vogelsberg's treatment in the Dane County jail between July and September 2014. Vogelsberg contends that medical staff failed to provide appropriate medical care for pain he was experiencing in his chest and abdomen, which was ultimately determined to be caused by a duodenal ulcer. Vogelsberg also contends that jail staff placed him in restrictive conditions of confinement to hide their own failure to properly treat his ulcer and to retaliate against him for complaining about the inadequate care. Finally, he says that the policies of Dane County and Correct Care Solutions are responsible for his poor treatment. He asserts claims under the Constitution and state law.

Two motions for summary judgment are before the court, one filed by Dane County, Dkt. 76, and one filed by the remaining defendants, including Correct Care, Dkt. 70. No reasonable jury could find that any of the defendants violated Vogelsberg's constitutional rights, so I will dismiss Vogelsberg's federal claims with prejudice. And because I am dismissing

---

[1] I have amended the caption to reflect the correct spelling of Melissa Bennett's name, as identified in defendants' summary judgment materials.

all of the federal claims before trial, I will dismiss Vogelsberg's state-law claims under 28 U.S.C. § 1367(c)(3), which allows Vogelsberg to refile his claims in state court.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

Vogelsberg was incarcerated at the Dane County jail from December 28, 2012, through December 27, 2014, as a pretrial detainee. Defendant Correct Care Solutions is a private correctional healthcare provider that contracted with the Dane County Jail to provide health care services to inmates. Correct Care employed all the individual defendants in this case.

**A. Medical care**

On July 26, 2014, Vogelsberg submitted an "inmate medical request" in which he said that he had been experiencing "severe" cramps and pain in his "lower chest/upper abdomen" for approximately two weeks and he wanted an x-ray. Defendant Cheryl Walters, a nurse, examined Vogelsberg the next day. According to Walters's notes, Vogelsberg reported that his pain was an eight out of ten and that it was hard to defecate.

Walters checked Vogelsberg's vitals, performed an EKG, and observed that his stomach was distended. She consulted with Kim, who prescribed milk of magnesia and a stool softener. Kim says that he believed that Vogelsberg was suffering from GERD (gastroesophageal reflux disease) or "another dietary issue." Dkt. 148, ¶ 82. Walters directed Vogelsberg to engage in more exercise and to notify medical staff if the problem gets worse. Vogelsberg already had a prescription for naproxen for dental pain. On July 28 and again on August 21, Kim renewed the naproxen prescription at Vogelsberg's request.

Vogelsberg did not take the milk of magnesia or the stool softener. He says that was because Walters told him that the purpose of both were "to help him poop" and he "was pooping just fine." Dkt. 148, ¶ 88.

On August 5, Kim gave Vogelsberg a routine exam. Vogelsberg's vitals were normal. Kim also reviewed the results of Vogelsberg's PT/INR testing (international normalized ratio and prothrombin time), which measures blood levels and coagulation. (Because of a history of cardiovascular issues, Vogelsberg was prescribed Warfarin, a blood thinner.) Vogelsberg's test results were normal as well. Defendants say that Vogelsberg didn't complain about chest or abdomen pain during the exam. Vogelseberg says that he told Kim that he was still having pain in his chest and abdomen, but Kim told Vogelsberg that he was "already on pain medication" and he was "not going to prescribe a narcotic." Dkt. 143, ¶ 14.

On August 8, Kim again ordered PT/INR testing, and again the results were normal. On August 23, Kim reduced Vogelsberg's Warfarin dose after Kim observed abnormal lab results.

On September 2, Kim ordered testing of Vogelsberg's blood levels and coagulation. The results were normal.[2]

Also on September 2, Vogelsberg submitted a medical request complaining of "severe toratic/abdominal pain." On September 3 defendant Satinder Dhanoa, a nurse, examined

---

[2] Vogelsberg says that his test results were a "cause for concern" because they were "marked with an H for High." Dkt. 148, ¶ 3. But the document Vogelsberg cites also says that the results were within the "therapeutic range." Dkt. 73-4, at 29. Vogelsberg doesn't cite any evidence suggesting that Kim should have been concerned about the results, which showed that his ratio was 2.6. *See* Mayo Clinic, "Prothromhin time test," https://www.mayoclinic.org/tests-procedures/prothrombin-time/about/pac-20384661 ("An INR range of 2.0 to 3.0 is generally an effective therapeutic range for people taking warfarin.").

3

Vogelsberg. Vogelsberg told Dhanoa that his pain was a ten out of ten at the moment, but it varied between five and ten. Vogelsberg's blood pressure, oxygen level, and pulse were normal. Dhanoa noted "mild tenderness on palpation" of Vogelsberg's abdomen but no discolorization of the skin. Dhanoa consulted with Kim, who prescribed Extra Strength Tylenol and directed Vogelsberg to "submit another slip if symptoms do not go away." Kim says that Vogelsberg's lab results didn't indicate a "GI bleed" or other acute condition, so Kim suspected that Vogelsberg had "dyspepsia or GERD due to the symptoms, his medical history, recent similar complaints, and that he did not finish his July/August 2014 medication regimen to treat that issue." Dkt. 148, ¶¶ 105–06.

Voglesberg did not seek medical care from September 3 to September 7. On September 8, defendants Stephanie Webster and Brenda Bredlow, both nurses, examined Vogelsberg, who complained that his pain was still a ten out of ten. The nurses assessed Vogelsberg's breathing, circulation, orientation, skin, chest, eyes, extremities, motor functions, and vital signs. He was able to walk without difficulty. They observed that he was not exhibiting shortness of breath, dizziness, or "signs or symptoms of discomfort." Dkt. 148, ¶ 119. After the nurses communicated their findings to Kim, he placed a "hold" on Vogelsberg's pain medication to "prevent it from masking any of Mr. Vogelsberg's symptoms during ongoing treatment." Dkt. 148, ¶ 76. Kim also ordered a liquid diet and lab tests. He directed staff to check vital signs and conduct abdominal assessments every shift.

Later the same day, Vogelsberg told Webster that he believed he was suffering from appendicitis. Weber took Vogelsberg's vitals, which were all normal. She also observed that Vogelsberg was able to walk and talk without problems.

Between September 8 and September 11, staff checked Vogelsberg's vital signs nine times. Each time they were normal.

On September 9, defendant Melissa Bennett, a nurse, drew Vogelsberg's blood for the lab tests. When Vogelsberg told her that his stool was black, she contacted Kim, who provided instructions to collect a stool sample so that it could be tested. (The parties do not say whether staff ever collected a stool sample, but Vogelsberg doesn't allege that Kim was responsible for any failure to follow through with the directive.)

Also on September 9, Dhanoa examined Vogelsberg. She observed that his vitals were normal, he was not suffering from any breathing issues, he was not exhibiting edema, and he was able to walk and talk. Vogelsberg denied nausea and vomiting. Dhanoa contacted Kim, who ordered a urinalysis, x-rays, and Pepto-Bismol. He also directed staff to place Vogelsberg in a cell with a camera, so that he could be continually monitored. An x-ray was scheduled for September 12.

On September 10, a test of Vogelsberg's urine showed increased white blood cells, which is an indicator of a urinary tract infection. When Kim received the results, he ordered an antibiotic. Later that day, Tenzen Enders, a nurse, examined Vogelsberg. His vital signs were normal, but she observed "hypoactive bowel sounds" and that his abdomen was tender to the touch.

On September 11, while he was attending his criminal trial, Vogelsberg became nauseated. During a break, Kim examined Vogelsberg, who said that his last stool was black, but he had not had a bowel movement for three days. Kim advised Vogelsberg that he may be suffering from gastrointestinal bleeding. Kim wanted to keep Vogelsberg in a medical observation cell, but Vogelsberg had to return to his trial. Vogelsberg agreed to a blood draw

5

for lab tests. Kim advised the deputy sheriff to call "medical" if Vogelsberg began feeling weak, dizzy, lightheaded, or nauseated.

Later the same day, Kim received the results of the lab tests. When he saw that the results were abnormal, he ordered that Vogelsberg be taken to the hospital. Vogelsberg was diagnosed with a duodenal ulcer and had surgery on September 12.

**B. Placement on medical observation and suicide watch**

Shortly after Vogelsberg was taken to the hospital, a correctional officer (not a defendant) reported to the medical unit that Vogelsberg said during a recent telephone call that he "should have gotten the gun yesterday, but today is the day." Vogelsberg denies that he made that statement. Mental health staff stated in a progress note that "patient will need to be assessed by [mental health] during booking to decide on SU precautions." Dkt. 143-1, at 74.

On September 12, defendant James Matthews, the director of nursing at the jail, discovered that Vogelsberg had purchased 50 tablets of aspirin in 2013. Matthews contacted hospital staff to inform them of the possibility that Vogelsberg's abdominal pain was the result of an over-ingestion of aspirin. Notes from hospital staff state that Vogelsberg "has variably expressed suicidal ideation in the last couple days but denied this to us." Dkt. 74-4, at 2.

In response to Matthews's discovery about Vogelsberg's purchase of aspirin, correctional staff conducted an investigation, which included an interview with two inmates who were housed on the same cell block as Vogelsberg. One of the inmates said that Vogelsberg "should be put on suicide watch," that Vogelsberg had mentioned being suicidal, and that he heard Vogelsberg talking about "cheeking" his medication so that he could save them and take them all at once. Dkt. 143-2, at 4.

Later on September 12, hospital staff called to inform jail staff that Vogelsberg's lab results did not show any aspirin in his blood.

Also on September 12, a hospital psychiatrist evaluated Vogelsberg. Vogelsberg acknowledged that he had considered suicide "2–3 years ago," going so far as to fashion a noose before changing his mind. But he denied that he was currently suicidal. The psychiatrist also observed that "Dane County Jail notes that he has been reported to have suicidal ideation periodically." In his "risk assessment," the psychiatrist wrote that Vogelsberg's "imminent risk level" was "low," his "chronic risk level" was "moderate," and his "current risk factor[]" was that he is "[o]n trial for homicide 1st degree."

On September 15, Vogelsberg returned to the jail. Kim ordered that Vogelsberg be placed in the "med dorm" for "close observation" and to be referred to mental health for evaluation of possible suicidal ideations. He directed staff to check Vogelberg's vital signs every shift. He ordered additional blood tests and a follow-up appointment.

An hour later, mental health staff placed Vogelsberg on suicide watch. In explaining the decision, staff wrote that other inmates alleged that Vogelsberg had made statements about saving pills for an overdose and that Vogelsberg had passed a note to his criminal attorney that stated, "I should have shot myself when I had the chance, LOL." Dkt. 143-1, at 79. Staff also noted that Vogelsberg denied that he was suicidal. Staff recommended that Vogelsberg be placed in solitary confinement and receive a safety smock and finger food, but they did not recommend a "sharps" restriction.

On September 16, a psychiatrist evaluated Vogelsberg and concluded that he was not suicidal. Vogelsberg was returned to general population on September 23, but the parties do not say who made that decision or why.

7

ANALYSIS

A.  Discovery

Vogelsberg raises a general objection that he was unable to properly respond to defendants' motions for summary judgment because he was unable to obtain all the discovery he needed. This argument fails.

Discovery opened in July 2018. *See* Dkt. 38. After defendants filed their summary judgment motions in May 2019, Vogelsberg had *nine months* to respond, which is nine times longer than other pro se parties. During all that time, Vogelsberg filed only one motion seeking additional discovery. I denied that motion because Vogelsberg's discovery requests were overbroad and disproportionate to the needs of the case. *See* Dkt. 104, at 6–7. Most of the information sought was irrelevant. For example, he asked for all "non-medical policies" of Correct Care Solutions, the names and credentials of all CCS employees at the Dane County jail in the last 10 years, information about CCS's contracts with facilities other than the Dane County jail, all grievances filed by Dane County jail inmates against CCS, all lawsuits within the last 16 years brought by inmates for inadequate medical care, all disciplinary records of the defendants, and any investigations at the Dane County jail related to the treatment of inmates. Vogelsberg didn't explain how any of that information was relevant to his claims, and he still doesn't explain how it would be helpful to defeat defendants' summary judgment motions.

Vogelsberg identifies two other categories of documents that he says he needs. First, he says that defendants withheld 400 pages of medical records from him. He cites a certificate of service in which defendants say that they "removed approximately 400 pages of irrelevant records comprised of duplicative records, historical documents gathered at booking, and dental records." Dkt. 105. Vogelsberg doesn't explain why he would need any of those documents. In

8

any event, he did not object to the exclusion when defendants produced Vogelsberg's medical records in August 2019, so he forfeited that issue.

Second, Vogelsberg says that he has "not been able to obtain medical record[s] from U.W. Hospital." Dkt. 159, at 22. But Vogelsberg never sought to subpoena those records, so that issue is forfeited as well. In any event, the primary issue in this case relates to the treatment that *defendants* provided, not the hospital. Vogelsberg doesn't explain how additional hospital records would help him show that defendants violated his constitutional rights.

**B. Medical care**

A prison official violates a detainee's right to medical care under the Due Process Clause if: (1) the defendants acted with purposeful, knowing, or reckless disregard of the consequences of their actions; and (2) the defendants' conduct was objectively unreasonable. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352–53 (7th Cir. 2018). It is not enough to show negligence. *Id.* at 353. In response to a motion for summary judgment, it is the plaintiff's burden to show that a reasonable jury could find in his favor on each of these elements. *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999).

In his summary judgment brief, Vogelsberg contends that defendants violated the Due Process Clause in two ways: (1) they failed to diagnose his ulcer sooner; and (2) they provided medication that they knew was ineffective.[3] The way Vogelsberg frames his claims now is not identical to the claims that I allowed Vogelsberg to proceed on, *see* Dkt. 8, at 3, but defendants don't object, so I will consider Vogelsberg's claims as he frames them now.

---

[3] Vogelsberg also raised a state-law claim that Kim acted negligently by prescribing naproxen and a blood thinner at the same time, but he does not contend that Kim violated the Due Process Clause by prescribing both medications. *See* Dkt. 8, at 3 n.2.

9

Defendants do not seek summary judgment on the ground that Vogelsberg wasn't suffering from a serious medical need. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (ulcers qualify as a serious medical need). And although defendants deny that they were aware that Vogelsberg was suffering from an ulcer, they don't deny that he was complaining of symptoms that required medical attention. Rather, defendants contend that the treatment they provided was reasonable based on the information that they had at the time. Because Vogelberg's interactions with Kim were different from his interactions with the nurses, I will consider them separately.

1. **Kim**

    a. **Delay in diagnosing**

Vogelsberg's primary contention is that it took too long for Kim to determine that Vogelsberg may be suffering from an ulcer. Vogelsberg began complaining about pain in his chest and abdomen on July 26, 2014, but Kim did not send Vogelsberg to the hospital for treatment until September 11, 2014. Vogelsberg focuses on two ways where he thinks that Kim went wrong: (1) Vogelsberg had no history of GERD, so Kim shouldn't have suspected that Vogelsberg was suffering from that condition; and (2) Kim should have ordered an x-ray sooner or otherwise conducted tests that would have uncovered Vogelberg's ulcer.

To support his first contention, Vogelsberg cites a hospital record from January 2013, when Vogelsberg was taken to the emergency room for chest pain. Dkt. 74-1, at 6. After ruling out a cardiac problem, hospital staff wrote that "[p]ain was thought be related to anxiety in setting of PTSD with contribution from musculoskeletal pain or GERD." *Id.* But staff also noted that medication for GERD did "not resolve discomfort." *Id.*

The record that Vogelsberg cites may suggest that Vogelsberg wasn't suffering from GERD in January 2013. But that fact has little bearing on whether Kim violated the Due Process Clause. The question isn't whether Kim diagnosed Vogelsberg correctly. The question is whether Kim's treatment decisions were objectively unreasonable. Vogelsberg can't meet that standard. Even if Vogelsberg wasn't suffering from GERD in 2013 that doesn't mean that he couldn't suffer from it later. Vogelsberg doesn't allege that his symptoms were inconsistent with a GERD diagnosis. *See Wright v. Knibbs*, No. 13 CIV. 2849 CM, 2015 WL 5547454, at *3 (S.D.N.Y. Sept. 16, 2015) ("[M]id-sternal chest pain is often a symptom of acid reflux.").[4] In fact, GERD can *cause* certain kinds of ulcers.[5] So trying to rule out GERD as a possible cause of Vogelsberg's symptoms was not unreasonable.

To support his contention that Kim should have ordered an x-ray before September 9, Vogelsberg points to his own request for an x-ray in July 2014. But "an inmate is not entitled to demand specific care, and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (internal quotation marks omitted). Further, an x-ray "is simply a diagnostic tool, and the decision to forego diagnostic tests is a classic example of a matter for

---

[4] The Mayo Clinic, which Vogelsberg cites throughout his summary judgment materials, also recognizes chest pain as a common symptom of GERD. Mayo Clinic, "Gastroesophageal reflux disease (GERD)," https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940.

[5] *See* University of Michigan, "GERD: Esophageal Erosion and Ulcers," https://www.uofmhealth.org/health-library/rt1441 ("The backup, or reflux, of stomach acids and juices into the esophagus that occurs with gastroesophageal reflux disease (GERD) can wear away (erode) the lining of the esophagus and cause sores, called ulcers.").

11

medical judgment." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (internal quotation marks omitted).

In this case, Kim chose to rule out a dietary issue before considering other options. That was not unreasonable. *See Zackery v. Mesrobian,* 299 F. App'x 598, 601–02 (7th Cir. 2008) ("Although it may have been prudent for [the doctor] to order diagnostic testing . . . , his failure to choose the best course of action does not amount to a constitutional violation."). Vogelsberg complains that he continued to suffer through August 2014 without Kim changing his treatment. But Vogelsberg admits that he didn't *comply* with Kim's treatment: Vogelsberg never took the milk of magnesia or the stool softener that Kim prescribed. Vogelsberg says that he didn't comply because Walters told him that both the milk of magnesia and the stool softener were to help with bowel movements, which he wasn't having a problem with.[6] But milk of magnesia is an *antacid* and a treatment for GERD. *See, e.g.*, *Young v. Blozinski*, No. 18-C-39, 2018 WL 4964612, at *1 (E.D. Wis. Oct. 15, 2018), *aff'd*, 770 F. App'x 277 (7th Cir. 2019); *Thomas v. Wexford Health Sources, Inc.*, No. 15-cv-108-rjd, 2018 WL 1610049, at *1 (S.D. Ill. Apr. 3, 2018). If Vogelsberg was confused about Kim's treatment decisions, he should have asked Kim for clarification rather than simply disregarded his instructions. By failing to comply or seek clarification, Vogelsberg prevented Kim from ruling out a dietary issue.

Vogelsberg points to no other evidence suggesting that Kim acted unreasonably by failing to conduct more tests or that Kim otherwise unreasonably delayed appropriate treatment. It is undisputed that Vogelsberg's blood tests were within normal limits and were

---

[6] That allegation is inconsistent with Walters's notes, which state that Vogelsberg complained that it was "hard to def[e]cate." Dkt. 74, at 52. Vogelsberg didn't challenge that portion of Walters's notes in response to defendants' proposed findings of fact, *see* Dkt. 148, ¶ 81, but I will assume for the purpose of summary judgment that the notes are incorrect.

not suggestive of an internal bleed through July, August, and the beginning of September 2014. When Vogelsberg's symptoms persisted into September, Kim placed Vogelsberg on a liquid diet and directed staff to assess his condition during every shift. When Vogelsberg reported that his stool was black, Kim ordered an x-ray and directed medical staff to collect a stool sample for testing. On September 11, when Vogelsberg reported that he was nauseated and hadn't had a bowel movement in three days, Kim suspected a GI bleed and ordered immediate testing. When Kim received the results later that day and saw that they were abnormal, he sent Vogelsberg to the hospital. That conduct is well within the bounds of what is acceptable under the Due Process Clause.

    b. **Pain medication**

Vogelsberg contends that Kim that violated the Due Process Clause by prescribing naproxen even though he knew it was not effective for easing Vogelsberg's pain. The evidence doesn't support that contention. It is undisputed that *Vogelsberg* repeatedly requested naproxen as a pain reliever in July and August 2014. *See* Dkt. 148, ¶¶ 68 and 70. When Vogelsberg requested a different pain reliever, such as Tylenol, Kim complied with that request as well. *Id.*, ¶¶ 57–61. *See also id.*, ¶ 104 (prescribing Extra Strength Tylenol on September 3, 2014 when Vogelsberg complained that his pain was getting worse).

It is disputed whether Vogelsberg asked for narcotics at an August 5 appointment with Kim, but the dispute isn't material. Vogelsberg only first complained to Kim about pain in his chest and abdomen on July 26, and Vogelsberg doesn't allege that he gave Kim any information suggesting that he needed a narcotic on August 5. The court of appeals has consistently rejected claims that prisoners are constitutionally entitled to demand a particular type of medication, especially narcotics. *See, e.g., Lockett v. Bonson,* 937 F.3d 1016, 1024 (7th Cir. 2019) ("We

13

routinely have rejected claims, however, where a prisoner's claim is based on a preference for one medication over another unless there is evidence of a substantial departure from acceptable professional judgment."); *Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019) ("[J]ust because the staff declined to provide him with his desired prescription pain medicine . . . does not mean that the course of treatment was objectively unreasonable."); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("Using [pain killers] entails risks that doctors must consider in light of the benefits. . . . Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."). Vogelsberg hasn't shown that Kim's choice of pain medication was objectively unreasonable.

2. **Nurses**

Vogelsberg says almost nothing in his brief about his claims against the nurses. Regardless, he hasn't provided evidence that any of the nurses violated his rights. Each nurse who is named as a defendant examined Vogelsberg only once or twice. In each case, the nurse assessed Vogelsberg, took his vitals, recorded his complaints, and sought instructions from Kim. It is well established that a nurse is entitled to defer to instructions given by physicians unless it is obvious that the physician's instructions will risk the prisoner's health. *See McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 887–88 (7th Cir. 2018). Because I have concluded that Kim did not violate the Due Process Clause, it follows that it was appropriate for the nurses to rely on Kim.

**C. Placement on medical observation and suicide watch**

I allowed Vogelsberg to proceed on claims that: (1) Kim placed Vogelsberg in "segregation" because Vogelsberg complained about his medical care, in violation of the First Amendment; (2) Matthews placed Vogelsberg in "segregation" without a legitimate penological

14

interest, in violation of the Due Process Clause. As it turns out, the facts are a bit more complicated.

As for where Vogelsberg was placed, it was not disciplinary segregation but rather medical observation and suicide watch. Defendants don't describe the conditions of those statuses, but it does appear to be undisputed that either medical observation or suicide watch or both involved solitary confinement.

As for how the defendants were involved, Kim made the determination to place Vogelsberg on medical observation, but neither defendant placed Vogelsberg on suicide watch. Kim referred Vogelsberg for a mental health evaluation, but it was mental health staff who made the decision to place Vogelsberg on suicide watch. Matthews wasn't directly involved in either decision, but Vogelsberg contends that the suicide watch placement was Matthews's fault because Matthews falsely alleged that Vogelsberg had intentionally overdosed on aspirin. I will assume that both Kim and Matthews contributed enough to the decisions so that they were "personally involved." *See Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) ("Individual liability pursuant to § 1983 requires personal involvement in the alleged constitutional deprivation.").

To prevail on his retaliation claim against Kim, Vogelsberg must prove three things: (1) he was engaging in activity protected by the Constitution; (2) Kim's conduct was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) Kim subjected Vogelsberg to adverse treatment because of the plaintiff's constitutionally protected activity. *Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016); *Gomez v. Randle*, 680 F.3d 859, 866–67 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 555–56 (7th Cir. 2009). To prevail on his due process claim against Matthews, Vogelsberg

must show that Matthews's conduct was either motivated by an intent to punish or was not reasonably related to a legitimate purpose such as maintaining security and order. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).

Vogelsberg's claim against both defendants fails because he has not adduced any evidence that either defendant was trying to retaliate against him or punish him. Rather, the decisions to place Vogelsberg on medical observation and suicide watch were reasonably related to legitimate interests in protecting Vogelsberg's health and safety.

Vogelsberg's primary argument in support of this claim is that he was *not* suicidal, so any conduct by defendants must have been motivated by ill intent. Vogelsberg is in the best position to say whether he was experiencing suicidal ideations, but his subjective state of mind has little probative value in showing what *defendants* intended. More relevant are the facts that were available to defendants at the time.

Matthews's sole act relevant to this case was to inform hospital staff that Vogelsberg had purchased 50 tablets of aspirin, so that they could consider whether that had contributed to his hospitalization. It is undisputed that Vogelsberg *did* purchase 50 tablets of aspirin. Although Vogelsberg accuses Matthews of using the aspirin purchase to cover up Correct Care's failure to provide adequate medical care, he cites no evidence to support that theory. Vogelsberg points out that he purchased aspirin in 2013, not 2014, so the purchases should not have raised alarm. Matthews acknowledge the dates of purchase in his progress notes, but said it was uncertain whether Vogelsberg had been hoarding medication. Dkt. 74-1, at 108–09. In the absence of any evidence undermining Matthews's explanation, there is no basis for Vogelsberg's claim against Matthews.

The undisputed evidence also supports Kim's decision to refer Vogelsberg for a mental health evaluation. In addition to Matthews's discovery that Vogelsberg had ordered 50 tablets of aspirin, Vogelberg's medical records included the following information: (1) a correctional officer reported that Vogelsberg said during a recent telephone call that he "should have gotten the gun yesterday, but today is the day"; (2) hospital staff wrote that Vogelsberg had expressed suicidal ideation; (3) an inmate in Vogelsberg's cell block said that Vogelsberg had mentioned being suicidal, and that Vogelsberg had been talking about "cheeking" his medication so that he could save them and take them all at once; and (4) Vogelsberg passed a note to his lawyer that "I should have shot myself when I had the chance, LOL." That evidence is more than sufficient to support Kim's decision.

Vogelsberg attacks all the evidence cited above on the ground that it is based on lies or a misunderstanding of Vogelsberg's intentions. But even if that is true, it doesn't matter. None of the information originated with Kim, so Kim was entitled to rely on it, unless Kim was aware that the information was false, something that Vogelsberg hasn't shown. The question for a retaliation claim isn't whether the defendant was *correct*, it is whether he took an adverse action against the plaintiff because of the plaintiff's constitutionally protected activity. Because Vogelsberg hasn't presented evidence that Kim disbelieved the information in Vogelsberg's medical records, the retaliation claim fails. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 580–81 (7th Cir. 2015) (even if the reason for the defendant's decision is "foolish or trivial or even baseless," the reason is not retaliatory "so long as it is honestly believed").

### D. Municipal liability

Vogelsberg contends that the actions of the individual defendants were based on unconstitutional policies of Correct Care and Dane County. Because I have concluded that

17

Vogelsberg's claims against the individual defendants fail, his claims against the municipal defendants fail as well. *See Elizarri v. Sheriff of Cook Cty.*, 901 F.3d 787, 791 (7th Cir. 2018) ("[A] municipality cannot be held liable without an underlying violation of the Constitution by a municipal employee."); *Hart v. Mannina,* 798 F.3d 578, 596 (7th Cir. 2015) ("Because the district court properly dismissed [the plaintiff's] claims against . . . the [individual] officers . . . , [the plaintiff's] claims against several supervisory defendants and against the City of Indianapolis also fail.").

**E. State-law claims**

Vogelsberg relies on 28 U.S.C. § 1367 as the basis for exercising jurisdiction over his state-law claims. "Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). In this case, neither side identifies any unusual circumstances that would justify a decision to retain jurisdiction over the state-law claims, so I will dismiss those claims without prejudice to Vogelsberg refiling them in state court.

**F. Conclusion**

Vogelsberg suffered from a serious medical condition requiring hospitalization and surgery. He suffered significant pain for several weeks before obtaining successful treatment. And when he returned from the hospital, he was placed in solitary confinement for his own protection.

Vogelsberg, understandably, was frustrated over staff's failure to stop his pain before his hospitalization and their decision to place him in restrictive conditions when he returned. And he may be correct that his ulcer could have been detected earlier if Kim had ordered an x-

18

ray when Vogelsberg requested one and that his placement on medical observation and suicide watch was unnecessary. But the question in this case isn't whether, with the benefit of hindsight, the defendants always made the correct decision or even whether defendants could have done a better job. A constitutional violation requires more than that. Because the medical staff's decisions were objectively reasonable and Vogelsberg's placement on medical observation and suicide watch were reasonably related to legitimate interests, defendants are entitled to summary judgment on all of Vogelsberg's federal claims.

ORDER

IT IS ORDERED that defendants' motions for summary judgment, Dkt. 70 and Dkt. 76, are GRANTED as to Jeffrey Vogelsberg's federal claims. Those claims are DISMISSED with prejudice. In accordance with 28 U.S.C. § 1367(c)(3), Vogelsberg's state-law claims are DISMISSED without prejudice to his refiling them in state court. The clerk of court is directed to enter judgment and close this case.

Entered March 23, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge